GEORGE BIRRELL, Inc., Appellant, v. FIDELITY & CASUALTY COMPANY OF NEW YORK et al., Appellees.

**INSURANCE:** Fidelity Insurance—''Loss and Wrongful Abstraction.''
1   A fidelity bond conditioned to indemnify the incorporated obligee against ''loss * * * of any money * * * through the * * * wrongful abstraction of'' the obligee's general manager, is not breached as to the surety by the act of the said manager in applying the funds of the said obligee to the payment of obligee's valid pre-existing debts, even though it be true that the general manager had individually obligated himself to the obligee to pay said debts.

**JUDGMENT:** Conclusiveness—Nonidentity of Parties.   A consent
2   decree which finds that certain defendants had, by a series of transactions, entered into an unlawful combination in restraint of trade, is not admissible in a subsequent action between *one* of said defendants and a stranger to the decree, on the duly joined issue whether the same and identical transactions constituted an unlawful combination in restraint of trade, even though the offer is made against the one who was a party to the former decree.

*Appeal from Muscatine District Court.*—A. J. HOUSE, Judge.

MAY 9, 1922.

SUIT against a fidelity insurance company on a bond given to indemnify the plaintiff against loss by reason of the wrongful abstraction of its funds by its manager. The manager intervened, and was also made a party defendant by amendment to the petition. The cause was tried to the court without the intervention of a jury, and judgment was rendered dismissing plaintiff's petition, and it appeals.—*Affirmed.*

*Hoffman & Hoffman* and *W. M. Keeley,* for appellant.

*Johnson, Donnelly & Swab, W. R. Jayne,* and *J. F. Devitt,* for appellees.

ARTHUR, J.—The appellant is a corporation organized under

.the laws of the state of New York and authorized to transact business in Iowa.   Its office and principal place of business is at

1. INSURANCE:
fidelity insur-
ance: "loss and
wrongful ab-
straction."

Muscatine.   The general nature of its business is that of buying, handling, and selling mussel shells which are gathered from the waters of the Mississippi River and its tributaries and are used in the manufacture of pearl buttons.

Prior to the 26th of March, 1917, the appellee George Birrell was the sole owner of all of the stock of said corporation.

The record discloses that at that time there were a large number of corporations, firms, and individuals located in different parts of the United States who were engaged in the manufacture of pearl buttons from mussel shells.   In the spring of 1917, representatives of certain of these institutions approached the appellee Birrell with a proposition to enter into a business arrangement by which the various manufacturers of pearl buttons should secure the supply of mussel shells needed by them in their business, through the appellant corporation, and that the latter should secure said shells from numerous shell diggers, or producers, who gathered the same from various streams.

It also appears from the evidence that prior to said time the parties interested in the manufacture of pearl buttons had secured a monopoly of the Barry automatic machine, which is a machine used in the manufacture of pearl buttons, and is considered the most efficient machine of that character.

Meetings were held between the appellee Birrell and the representatives of the various concerns interested in the project. In the latter part of March, 1917, an arrangement was entered into between these various parties and Birrell, for the carrying out of the proposed plan of operation.

As a part of the general arrangement, a written contract was made between the appellant corporation and the appellee Birrell, who, as before stated, was at said time the sole owner of the stock of the appellant corporation.   This contract provided that Birrell was to be manager of the corporation and assume personal charge of the business of buying and handling mussel shells, and was to devote his entire attention to said

business during the season of 1917. It was also provided in said contract that:

"In the matters of general policy he [Birrell] · will solicit and receive suggestions and advice of the board of directors of said company, who have supervision of the affairs of the company, and any radical departure from the established methods is to be first approved by said board of directors. The plan of course of business of said corporation prepared in written form and adopted at this time is to be observed. He will make report of the business of said corporation to said board when requested. He shall give bond for the faithful performance of his obligations hereunder, and as such president and manager under the articles and by-laws of said corporation, in the sum of twenty-five thousand dollars ($25,000) to be underwritten by approved surety company and premium to be paid by said corporation."

Various provisions are made in said "plan" in regard to the general manner of conducting the business.

Two proposed forms of contract were agreed upon to be entered into between the appellant corporation and the various concerns engaging in said arrangement. One was a contract for the purchase of shells by the manufacturer from the appellant corporation, at and for the prices stated in a schedule attached to the contract. The other contract recited that, in view of the purchase of mussel shells by the manufacturer from the Birrell Company, Inc., the purchaser was to receive certain benefits in distribution of the profits of said corporation. This contract provided that at the close of the season the Birrell Corporation should pay to the purchaser of shells:

"A sum of money bearing such proportion to the total net profits of said corporation made and earned during the said shell-buying season of 1917, as the total value of shells sold and delivered to said purchaser by said corporation during said season, bears to the total value of said shells sold to all its purchasers by said corporation during said season."

This contract also provided that, to secure the performance of this agreement, certain certificates of the capital stock of the corporation were to be deposited in trust with a trustee, with the power vested in him thereunder to require of the said cor-

poration and its officers the performance of the profit-sharing contract. These two forms of contracts were adopted for the purpose of carrying out the general scheme entered into between the parties, and were used between said parties during the season of 1917. Birrell was to be paid a salary of $5,000 and traveling and business expenses.

After this arrangement had been consummated, Birrell entered upon his duties as manager of the appellant corporation, and furnished to said corporation a bond, executed by the appellee Fidelity & Casualty Company, as surety, in the principal sum of $25,000. Said bond is in the usual form of obligations of this character, and indemnifies the appellant, as an employer, against loss through the fraud, dishonesty, forgery, theft, embezzlement, or wrongful abstraction of the employee.

The appellant contends that, while engaged under his said contract of employment, Birrell wrongfully abstracted and withdrew funds and property of the appellant in an amount in excess of the penalty of said bond. The trial of the cause involved an extensive accounting of the moneys received and disbursed by Birrell during the period of time he operated the business of the appellant corporation under said contract. One of the defenses interposed was that the contract between the appellant corporation and Birrell was executed in pursuance of an illegal contract and scheme which were in contravention of the Federal statutes.

I. It is to be observed that this action is a suit against the Fidelity & Casualty Company on its bond given to the appellant.

Passing directly to the consideration of the question of liability on the bond, we have a situation where the appellant corporation, by a written contract, employed the appellee Birrell as its general manager, to conduct and operate its business for the season of 1917. The contract between the appellant and the said employee Birrell provided that Birrell should assume the management of the business of the corporation in the buying, selling, and handling of fresh-water mussel shells, and devote his personal attention thereto, until the 31st day of Decem-

ber, 1917. We have heretofore set out the important clause thereof.

The "plan" referred to in the contract between the appellant and Birrell contained, among other provisions, the following:

"The said George Birrell, Inc., will, before beginning the season of 1917, open a new set of books showing as assets, cash and property of actual value of three thousand dollars ($3,000), and as liabilities, only capital stock in the amount of three thousand dollars ($3,000), and on said books shall keep a record of all transactions of the corporation during the season of 1917. Old accounts of the said Birrell Corporation will be closed up by Mr. Birrell individually and separately from the business of the season of 1917."

After the contract had been entered into, the bond involved in this suit was furnished by the appellee to the appellant. The bond, or contract, provides that the appellant is to be indemnified:

"Against the loss, not exceeding twenty-five thousand dollars, of any money or other personal property (including money or other personal property for which the employer is responsible), through the fraud, dishonesty, forgery, theft, embezzlement, or wrongful abstraction of George Birrell, hereinafter called the employee, directly or in connivance with others, while the employee is engaged in the service of the employer, while this bond is in force."

At the threshold of the case we are met with the question as to whether or not there is evidence of the violation of the terms and provisions of the bond on the part of the appellee Birrell for which the appellee Fidelity Company is liable. Briefly stated, the contention of the appellant is that the "plan" which the appellant company adopted, and which is referred to in its contract with the appellee Birrell, became a part of the said contract by reference thereto, and that the bond of the surety company indemnified the appellant against loss or misappropriation by the said Birrell in performing his contract of employment, and in failing to carry out the same in strict ac-

cordance with the terms and provisions of the said so-called "plan."

Throughout the case, the appellant treats the employment of Birrell, and the "plan" adopted at that time, as, in effect, separating the life of the appellant corporation into two separate and distinct periods. For the period of its existence prior to that time, the appellant is referred to throughout as the "old company," and its assets as the "assets of the old company." From that time forward, counsel refers to the appellant as the "new company," and its assets as the "assets of the new company." However, there was no "old company" and no "new company." The appellant was the same corporate entity throughout. The appellee Birrell was employed as a manager, to conduct the business of the said corporation. The appellee Fidelity Company entered into a written contract to indemnify the appellant against loss through misconduct of said manager.

The only charge made in the petition is that a liability exists against the surety company because of "wrongful abstraction" by the employee. The situation presented is practically this: It is the contention of the appellant that the employee Birrell abstracted funds belonging to the appellant, by using the money of the appellant corporation to pay off indebtedness of the corporation that was outstanding and existing at the time Birrell was employed under this contract. It is appellant's claim, in effect, that Birrell used the money and funds of what appellant calls the "new" corporation to pay off the debts of the so-called "old" corporation.

The resultant accounting necessarily required an examination of the entire business of the corporation for the year 1917. A very large number of items are involved in this accounting, and obviously it is impossible for us, within the reasonable bounds of an opinion, to set out the contentions of the respective parties in regard to each of these several items. We pass directly, however, to the ultimate question which we think is determinative of the matters involved herein.

An examination of the record in respect to these several items leads us to the conclusion that the employee Birrell did use a substantial amount of the assets of the appellant company

for the year 1917 in payment of the pre-existing debts of the appellant.

Granting, for the sake of the argument, that the evidence shows that the employee Birrell used a large portion of the "new assets" (that is, the assets which accumulated after his employment) in payment of the "old debts" of the corporation (that is, the debts outstanding at the time of his employment), the question arises, Did the contract of indemnity of the surety company protect the appellant against such so-called "wrongful abstraction?"

In the first place, it is to be noted that the contract of indemnity of the surety company is not a contract guaranteeing the performance of the terms of the contract of employment on the part of Birrell. The guaranty company did not agree with the appellant to indemnify it for the failure on the part of Birrell to perform all of the things he undertook to do by his contract of employment. The contract of the surety company was only a contract to indemnify the appellant *"against loss,"* and the loss for which indemnity was to be paid was limited to loss that the corporation should suffer "through the fraud, dishonesty, forgery, theft, embezzlement, or wrongful abstraction" of Birrell. The claim made is solely for alleged "wrongful abstraction;" therefore, by the terms of the contract, before the appellant corporation can recover from the surety company, it must establish that it has suffered *"loss"* by "wrongful abstraction" of its money or other property.

In the so-called "plan" of the appellant appears the following clause:

"Old accounts of the said Birrell Corporation will be closed up by Mr. Birrell individually and separately from the business of the season of 1917."

We repeat that this suit is not against Birrell individually, to recover for a breach of the terms of his contract of employment by failing to "close up," individually, "old accounts" of the appellant corporation. The Fidelity Company in no way guaranteed that the appellee Birrell would "close up" the "old accounts" of the said corporation "individually and separately from the business of the season of 1917." We are not called

upon to determine whether or not the appellant may have a cause of action against Birrell individually for a breach of this contract. Nor are we called upon to construe the terms of the "plan" providing that the "old accounts" of the corporation will be "closed up" by Mr. Birrell "individually and separately from the business of the season of 1917."

At the time that appellant and Birrell entered into the contract of employment, the appellant was indebted to certain creditors. The evidence shows that, during the year 1917, Birrell paid this indebtedness from the assets of the corporation that came into his hands under his contract of employment. The question for our determination at this point is whether such payment of its debts constituted a "loss" to the appellant, and whether or not it was a "wrongful abstraction" of the assets of the corporation.

The contract or "bond" of the Fidelity Company in this case was a form of insurance. The liability of the Fidelity Company is limited to a "loss" sustained by the insured by reason of the thing insured against,—in this instance, "wrongful abstraction."

Did the appellant suffer a "loss" for which it can recover on this contract of insurance? It is elementary that the basis for recovery on any contract of insurance is a "loss" to the insured. A loss necessarily implies a deprivation or a damage. Its synonyms are "detriment," "privation," "injury," and "damage." Webster's Dictionary.

What "loss" did appellant suffer? Its outstanding debts were paid with its own funds. How did this constitute a "loss" to appellant, within the meaning of the contract of insurance?

What damage or injury has appellant suffered by the payment of its valid obligations out of its own assets? It is claimed that the adoption of the so-called "plan" of the appellant bound Birrell by contract "to close up individually" the "old accounts" of the appellant. Conceding this to be true, it would not in any manner change the liability of the appellant to its creditors to whom said accounts were owing. It could suffer no "loss" to itself by the payment of its own indebtedness with its own funds. If Birrell incurred a personal liability to the

appellant to pay these so-called "old accounts," it was a liability that was in no manner guaranteed or secured by the Fidelity Company. Its contract was limited to an indemnity for loss suffered by the appellant company. There was no such loss to the company by the payment of its valid, outstanding obligations.

It is not to be overlooked that the creditors of the corporation had a right to payment from the assets of the corporation. The appellant could not, by a system of bookkeeping, separate its old accounts from its new accounts and divide its so-called "old assets" from its "new assets" in any manner to change the status of outstanding creditors of . the corporation. Nor could it "lose" by the payment of its valid obligations, whether the same were due to "old" creditors or to "new" creditors.

At the threshold of the case, we think appellant has failed to establish that it has suffered a "loss," within the meaning of the contract of indemnity, by the appropriation of its assets to the payment of its bona-fide debts.

Was there a "wrongful abstraction" of appellant's assets? As before stated, we are not called upon to determine, in this case, any question of the individual liability of Birrell to appellant for failure on his part to perform the terms and conditions of his contract, unless such failure caused a loss to appellant by reason of the "wrongful abstraction" of appellant's assets.

The contract or bond of the Fidelity Company did not cover every liability or claim that may exist between the appellant and Birrell. *Sinclair & Co. v. National Sur. Co.*, 132 Iowa 549; *Monongahela Coal Co. v. Fidelity & Dep. Co.*, 94 Fed. 732; *Milwaukee Theatre Co. v. Fidelity & Cas. Co.*, 92 Wis. 412 (66 N. W. 360); *Kansas Flour Mills Co. v. American Sur. Co.*, 98 Kan. 618 (158 Pac. 1118).

The question is, Was it a "wrongful abstraction" of appellant's assets to use the same to pay appellant's debts, even though the employee was obligated to pay the same debts himself?

It is necessary that we bear in mind that the Fidelity Company did not assume in any manner whatsoever to guarantee the performance of the contract between appellant and Birrell.

It did not become in any sense a surety for the payment of any obligations that Birrell may have assumed to pay, if he did so assume them, for the appellant.

It only insured the appellant against "loss" by the "wrongful abstractions" of Birrell. Did the use of appellant's assets to pay appellant's debts constitute a "wrongful abstraction?" We think not, within the meaning of the contract of insurance. Birrell's obligations to the appellant have in no manner been changed. If he agreed to pay certain debts of the appellant's and has not paid them, he is still liable therefor to the appellant. But the Fidelity Company did not assume any liability whatever for the payment of these debts by Birrell. It did not undertake to indemnify appellant against the payment of its debts with its own funds.

It cannot well be said that the payment of appellant's obligations with its own assets constituted a "wrongful abstraction" of said assets, within the meaning of the contract of the Fidelity Company.

If the Fidelity Company, by its contract, had undertaken to guarantee the full performance of Birrell's contract with the appellant, we would have an entirely different question. But the liability of the Fidelity Company, as an insurer, cannot be extended beyond the reasonable limits of its contract. Within the meaning of that contract, there was no "wrongful abstraction" by the appellee, by the use of appellant's assets to pay appellant's legitimate debts.

The evidence upon the so-called "accounting" satisfies us that the items set out in appellant's petition, for which appellant seeks recovery in this action, did not constitute a "wrongful abstraction" which resulted in a "loss" to the appellant for which recovery can be had upon the contract of indemnity.

We have examined the evidence in regard to these various items. Some of it is in dispute. The finding of the trial court upon all disputed questions of fact has the force and effect of the verdict of a jury, and is binding upon us. We cannot try an action of this character *de novo*. The judgment of the trial

court has substantial evidence in the record to sustain it, and cannot be disturbed upon appeal.

Upon the entire record, we fail to find that appellant was entitled to recover on its contract ·with the Fidelity Company for the amounts paid by the employee Birrell out of the assets of appellant in satisfaction of the legitimate indebtedness of the appellant.

II. We next consider the question as to the alleged illegality of the contract between the appellant and Birrell. There was a conflict in the evidence with regard to whether or not the arrangement entered into between Birrell and the appellant and the several manufacturers of pearl buttons was an unlawful combination in restraint of trade. The provisions of 26 United States Statutes at Large 209 are as follows:

"Section 1. Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states, or with foreign nations, is hereby declared to be illegal. Every person who shall make any such contract or engage in any such combination or conspiracy, shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine not exceeding five thousand dollars, or by imprisonment not exceeding one year, or by both said punishments, in the discretion of the court.

"Section 2. Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several states, or with foreign nations, shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine not exceeding five thousand dollars, or by imprisonment not exceeding one year, or by both said punishments, in the discretion of the court."

It is unnecessary for us to set out in detail the testimony offered to support the contention of the appellee that the arrangement entered into between Birrell, the Birrell Corporation, and the several pearl button manufacturers was in contravention of this statute. The arrangement and plan of these parties, as shown by the evidence, was an attempt to secure a monopoly of the mussel shell industry, and was in restraint of

trade. The contention of the appellees in this regard is also supported by the manner in which the operations were carried on.

In May of 1917, the Birrell Corporation sent out a letter inquiring in regard to the operations of two concerns that were selling "blanks." The letter states:

"The buying of blanks from those concerns should be stopped immediately, unless they agree to buy the shells through this factory or through this concern."

There is proof to show that this letter was sent out with the approval of the board of directors, who had been elected as such board of directors of the appellant company in pursuance of the arrangement entered into between the appellant and the manufacturers.

The evidence also tends to show that the appellant published regular price lists made up from time to time at meetings of the directors and buyers from the several companies.

The various dealings and operations of the appellant were gone into at length in the evidence. There was evidence that the general plan and scheme entered into between appellant corporation and the various pearl button manufacturers, which in part involved the employment of Birrell as manager of the appellant, for the purpose of effectuating the business entered upon, was in violation of the Federal statutes, and was an illegal and unlawful scheme and plan.

The matter was put directly in issue by the pleadings, and the evidence is in dispute. The judgment of the trial court has the force and effect of the finding of a jury upon this question, and, under such circumstances, we cannot interfere.

III. The appellees offered in evidence the record of certain proceedings in the United States court for the Southern District of Iowa. It appeared therefrom that, in June, 1918, a petition was filed in said court charging the defendants therein, including the appellant, with having formed and having been engaged in an unlawful combination and conspiracy in restraint of trade and commerce.

2. JUDGMENT: conclusiveness: nonidentity of parties.

The combination so referred to in said action was the iden-

tical arrangement entered into by the appellant and the button manufacturers, in pursuance of which Birrell was employed to conduct the business of the appellant.

The parties alleged to be members of said conspiracy were made defendants in said action, and a final decree was entered in said action on June 28, 1918, adjudging and decreeing that the said parties, by said arrangement, had entered into an unlawful combination in restraint of interstate trade and commerce, and perpetually enjoining the parties from doing any act in pursuance of said unlawful combination. The attorneys appearing for the said defendants in said action indorsed on said decree a memorandum that it was entered by consent of all of the defendants. Error is predicated upon the receipt of this decree in evidence in this action. It is a well established and general rule that the judgment of the court operates as an estoppel only as between substantially the same parties, or their privies. *McDonald & Co. v. Gregory,* 41 Iowa 513; *Woodward v. Jackson,* 85 Iowa 432; *Sawyer v. Kelly,* 148 Iowa 644.

In *Chadima v. Kovar,* 168 Iowa 385, we said:

"If a judgment is admissible at all upon any question of fact involved therein, it is conclusive, and if because of lack of identity of parties it is not conclusive, it is then not even a circumstance which the jury may consider on that point."

Appellant invokes this well recognized rule, and argues that it was error to permit the introduction in evidence of the decree of the United States court in the trial of this case.

Appellee contends that the proceedings in the United States court, which culminated in the consent decree, were competent evidence in this case in the form of an admission that the appellant in this case was a party to an illegal combination in restraint of trade.

The appellant herein, and the various parties who entered into the plan and arrangement for conducting the business as heretofore described, in April, 1917, were made parties in said action, and the decree recites that, by consent of the defendants, the court finds, orders, and decrees that the defendants (naming them) have been engaged in the unlawful combination or con-

spiracy described in the petition, in restraint of interstate commerce in pearl buttons and in mussel shells.

The decree recites that the means and methods by which the objects of the combination and conspiracy were intended to be and were accomplished, included, among other things, "entering by the defendant manufacturers into a plan under which the defendant George Birrell, Inc., was constituted their agent to buy for them practically all of the shells required by them respectively, at agreed prices, thus placing in Geo. Birrell, Inc., the power to control in their interest the prices to be paid to the producers of shells." The decree enjoins each and all of the defendants from doing any act in pursuance of and for the purpose of carrying out the said combination and conspiracy.

We are of the opinion that this decree should not have been received in evidence, and that the appellant's objection thereto should have been sustained. The fact that the appellant consented that a decree of injunction might be entered against it was not a consent to or an admission of the verity of the findings of fact recited in said decree, for the purposes of this case.

We do not think, however, that the admission of this decree in evidence constituted reversible error in the instant case. There was much evidence outside of this decree to sustain the claim of illegality in the business in which appellant was engaged. In view of our conclusion as announced in the first division of this opinion, we would not feel warranted in ordering a reversal of the case because of the admission of this evidence, and deem it nonprejudicial.

IV. Appellant's further contention is that, even though the plan and arrangement entered into between the appellant corporation and Birrell and the button manufacturers was an unlawful combination in restraint of trade, and even though said contract could not be carried out and enforced between the parties, still Birrell was merely an agent of the appellant's, and that the bond entered into between the appellant and the appellee Fidelity Company was not a part of the said unlawful combination or conspiracy, nor so closely associated therewith

as to be rendered illegal, even if said arrangement between said parties was contrary to law.

The general rule is that, where two parties enter into an unlawful contract, neither one has any redress against the other for misconduct directly connected with the unlawful business. In such a case, the parties will be left where the court finds them. This is an ancient and well established rule, and needs no authorities to sustain it. This rule, however, in its general application, applies only to parties to such unlawful arrangement or contract, or to those so closely associated or connected therewith as to be held in law to be *in pari delicto:*

There was evidence in this case to sustain the contention that the scheme and plan entered into between the appellant and the various button manufacturers was an unlawful scheme, and was in violation of the Federal statutes. The employment of Birrell as manager of the appellant company for the year 1917 was an integral part of that unlawful plan and scheme. The situation was not one whereby the appellant, as a corporate entity, entered into an unlawful conspiracy with other parties, and then, wholly independently of such arrangement, employed Birrell as a manager and agent, simply to perform certain services, at a fixed salary. The scope of the scheme and plan was more inclusive than this. It was an arrangement by which the appellant, with others, was seeking to control the market in mussel shells, and as an essential part of the plan, there was involved the employment of Birrell in that business. True, he was employed at a fixed salary, to manage the business; but Birrell individually entered into the scheme and plan at its inception; he had a part in its formation; his services were provided for, and his salary fixed; and he was included in the general scheme as completely as the corporation bearing his name was included in it.

Whether or not, under such circumstances, the appellee Fidelity Company could be held on its independent contract of indemnity to the appellant, is a question we do not determine. The general plan required that such a bond be given. The authorities are not in harmony on the proposition. In

view of our conclusion of the other issues in the case, we make no pronouncement on this question.

We find no error in the record requiring reversal of the case. The judgment of the district court is, therefore,—*Affirmed.*

STEVENS, C. J., EVANS and FAVILLE, JJ., concur.